**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DANNY EUGENE THOMPSON                    *

Petitioner                               *

v                                        *          Civil Action No. WMN-14-1268

PATRICIA GOINS-JOHNSON and               *
DOUGLAS GANSLER
                                         *
Respondents

                                        ***

## MEMORANDUM

This matter is before the Court for consideration of Petitioner Danny Eugene Thompson's

Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. §2254.  ECF 1.  Respondents have

filed an Answer opposing the petition (ECF 5) and Thompson has filed a Reply (ECF 6). The

Court finds no need for an evidentiary hearing.  *See* Rule 8(a), *Rules Governing Section 2254*

*Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2016);  *see also Fisher*

*v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C.

§2254(e)(2)).   For the reasons that follow, the Petition shall be denied and a Certificate of

Appealability shall not issue.

## Evidence At Trial

Thompson was convicted of the felony-murder of Carlos Santay in the Circuit Court for

Baltimore County, following a jury trial.  The issue of whether Thompson killed Santay was

undisputed; rather, the trial centered around whether Thompson killed Santay during the course

of robbing him, supporting a conviction for first-degree felony-murder, or he simply panicked

and killed Santay without intent, supporting a conviction for second-degree murder or

manslaughter.

Santay's girlfriend, Claudia Salas, testified that on the day Santay was killed, May 10, 2008, she was pregnant and in labor with their first child.  She stated that Santay was planning to drive her to the hospital and left at approximately 4:00 p.m., to put gas in the car at a gas station approximately 2 blocks from their home.   She confirmed that Santay had over 500 dollars in his wallet when he left. When he did not return home, she was transported to the hospital via ambulance, gave birth to her child the following morning at 3:39 a.m.; and learned of Santay's death at 5:00 a.m.  Salas also identified a wallet and its contents, presented as evidence in court, as belonging to Santay.  ECF 5 at Ex. 2, pp. 72 – 83.  On cross-examination, Salas confirmed that when Santay's belongings were returned by the police, all of the cash he had in his wallet was also returned.  ECF 5 at Ex. 2, pp. 83 – 84.

Dr. Ripple, the medical examiner who performed the autopsy on Santay, testified that Santay suffered five stab wounds, two to his chest, two to his arm, and one to the top of his head; and six smaller cutting wounds, five to his left arm and one to his right hand.  ECF 5 at Ex. 2, p. 96.  She further testified that the wounds were inflicted by a single edged weapon such as a knife and that the two most serious wounds were the stab wounds to his chest.  *Id*. at pp. 100 – 101. One stab wound to the front of Santay's chest hit his heart and the second wound entered his chest cavity and nicked his lung, causing it to collapse.  *Id*. at pp. 101 – 103.  Dr. Ripple further testified that there was approximately one liter of blood in Santay's chest and that the wound to his heart filled the sack around his heart with blood, making it progressively difficult for his heart to beat due to the pressure of the blood.  *Id*. at pp. 111 – 19.

Dr. Ripple described some of the injuries on Santay's arms and hands as "defensive wounds" during her direct testimony, but admitted she could not determine how Santay was positioned in relation to his assailant.  *Id*. at p. 111.  On cross-examination, Dr. Ripple admitted

that some of the wounds on Santay's hand and face could have been the result of a "terminal collapse" which she described as a fall that occurs when a person is either wounded so badly or so ill that they can no longer stand.  *Id.* at p. 126 – 27.  Further, Dr. Ripple admitted under cross-examination that some of her explanations as to how Santay incurred some of the "defensive wounds" could not be derived from her examination of the body.  *Id.* at pp. 123 – 24.

Rachel Stokes (ECF 5 at Ex. 2, pp. 131 – 153; 155 – 167) and Nicole Harris (ECF 5 at Ex. 2, pp. 169 – 90; Ex. 3, pp. 5 – 37) testified for the State.  Stokes and Harris drove into the gas station where Santay and Thompson were.  Stokes testified that she got out of her car, leaving the three passengers in it, one of whom was Harris.  ECF 5 at Ex. 2, pp. 131 – 33.  She stated that upon approaching the cashier's booth she saw a "commotion" between two men, like they were fighting, but at first thought nothing of it.  *Id.*  Upon moving within approximately 10 to 15 feet of the affray, Stokes said she saw more of what was going on and heard Thompson saying "give it to me, just give it to me" and Santay replying, "you are not getting this."  *Id.* at p. 139.  Stokes then saw the knife in Thompson's hand and saw that Thompson was stabbing Santay.  *Id.*  According to Stokes's testimony, the assault lasted five to six minutes and Thompson was holding onto something Santay was holding in his hand.  *Id.* at p. 143.  Thompson then ran across Baltimore National Pike, the road where the Carroll Gas Station was located.  *Id.* at p. 147.

Under cross-examination, Stokes admitted that she did not include in her written statement to the police that she had heard words exchanged between Santay and Thompson.  *Id.* at pp. 157, 161.  Stokes confirmed that the words she heard spoken by Santay were in English. *Id.* at p. 164.

Harris testified that after leaving the car, Stokes returned "hysterical" and told them "he is stabbing him."  ECF 5 at Ex. 2, pp. 172 – 74.  Harris then looked and saw two men, one of whom was wearing a tan hooded sweatshirt and whose arm was moving in a stabbing motion. *Id*. at p. 175.  She further testified that when Thompson, the man she saw in the tan sweatshirt, was running across the road he dropped something, turned to pick it up, appeared to change his mind, left the item there, and continued to run away.  *Id*. at p. 180.  Harris told police about the dropped item when they arrived on the scene.  *Id*. at pp. 189 – 90.  On cross-examination, Harris confirmed that she saw Santay holding his wallet after Thompson had fled the scene.  ECF 5 at Ex. 3, p. 24.

Nelson Utley testified for the State and explained he was driving down Baltimore National Pike when he saw a man running across the highway, ducking in and out of cars on the road.  ECF 5 at Ex. 3, pp. 39 – 45; p. 41.  He pulled into the gas station and ran over to Santay, who he described as an Hispanic male standing near the cashier's booth, clutching his chest.  *Id*. at p. 42.  Utley testified that he was attempting to render assistance to Santay, but did not know what had occurred or how he was injured.  *Id*.  He described the women who were also there, among them Stokes and Harris, as screaming hysterically and not making sense.  *Id*. at p. 43. Utley then noticed there was blood on his hands as he was attempting to keep Santay on his feet and reassuring him that help was on the way.  *Id*. at p. 44.  He stated that someone else came over to assist Santay and confirmed on cross-examination that the person who assisted was Congressman Elijah Cummings.  *Id*. at pp. 45 and 54.  Utley stated during redirect that Cummings had taken a phone from one of the women, gave their location, and gave the phone back.  *Id*. at pp. 64 – 65.  Both Stokes and Harris stated during their testimony that they had been angered by news reports during which Cummings had stated he had been on the scene and tried

to render assistance because neither of them recalled he was there.  ECF 5 at Ex. 2, pp. 167 – 68; Ex. 3, p. 33.

Officer Robinson, the first uniformed police officer to respond to the scene, testified for the State.  ECF 5 at Ex. 3, pp. 66 – 73.  Robinson rendered first aid to Santay and described him as covered in blood, gasping for air, and unable to communicate  *Id*. at pp. 68 – 69.  After the paramedics arrived, Robinson spoke with the bystanders at the scene and was directed by Nicole Harris to the area of the sidewalk where Thompson had dropped something.  *Id*. at p. 70.  Robinson retrieved the item, later described as a piece of Santay's wallet, and moved it to the hood of the police car in order to preserve it.  *Id*. at pp. 70 – 71; 83.

Detective Matthew Walsh was the primary homicide detective assigned to investigate Santay's death and also testified for the State.  ECF 5 at Ex. 3, pp. 130 – 177; Ex. 4, pp. 4- 5.  He testified that Thompson was developed as a suspect following retrieval of surveillance video from a pawn shop located in the shopping center across the street from the gas station and interviews with two people who identified Thompson from still photographs taken from the video.  *Id*. at pp. 138 – 40.  Thompson was arrested on May 15, 2008, following a search of his house, located three-quarters of a mile from the crime scene.  *Id*. at pp. 140 – 42.  Walsh described Thompson's demeanor as upset and visibly shaken.  *Id*. at p. 143; *see also* Ex. 4, pp. 7 – 28 (cross-examination).  After Thompson was advised of his rights, he confessed to the crime.

In his confession Thompson explained he went to the gas station to sell music CDs he had made and was standing by the cashier's booth.  ECF 5 at Ex. 3, p. 158.  When Santay walked to the booth, Thompson asked him if he wanted to buy a CD and Santay declined.  *Id*.  Santay then removed his wallet to pre-pay for gas and Thompson stated he saw a lot of twenty-dollar bills inside his wallet.  *Id*.  He claimed that this angered him because he was broke and he

grabbed the wallet.  *Id.*  When Santay would not let go of the wallet a struggle ensued and Thompson stated that he remembered he had a knife so he removed the knife and stabbed Santay several times.  *Id.*  Thompson's confession was video recorded and the statements he made when Walsh and his partner drove him to the scene in an effort to locate the knife were audio recorded; the video and audio records were played for the jury.  *Id.* at pp. 167 – 174.

On cross-examination of Walsh it was established that Thompson had told police that Santay would not let him go during the struggle.  ECF 5 at Ex. 4, pp. 5 – 6.  It was further developed that Thompson was in tenth grade, enrolled in special education classes, and had never been arrested prior to this incident.  *Id.* at pp. 7 – 8.  Walsh also agreed that Thompson was at times during his interview crying so hard his speech could not be understood and that he had told Walsh he had prayed for Santay following the incident.  *Id.* at pp. 13; 16 – 18; 23.  Walsh also related that Thompson found out that Santay died from his injuries the day before his arrest. *Id.* at p. 24.  Defense counsel established through cross-examination of Walsh that Thompson was cooperative with police and that he had never been identified by witnesses at the scene as the person who committed the crime.  *Id.* at pp. 5 – 28.

Following Walsh's testimony the State rested its case.[1]  ECF 5 at Ex. 4, p. 37.  Defense counsel moved for judgment of acquittal on the charges of first degree murder and felony murder.  *Id.* at pp. 40 – 51.  With respect to the felony-murder count, counsel argued that the evidence, viewed in a light most favorable to the State, did not legally support robbery with a deadly weapon.  *Id.* at pp. 43 – 50.  Rather, she argued that there was no specific intent to commit robbery in this case because Thompson did not use the knife to threaten Santay prior to grabbing his wallet, making the case more akin to a "snatching" case. *Id.* at p. 45 – 46.  Had

---

[1]    Forensic evidence and test results gleaned therefrom were read into the record as stipulations.  ECF 5 at Ex. 3, pp. 109 – 113; 122 – 29.

Thompson intended to rob Santay, in defense counsel's view, he would have brandished the knife he had with him first or in concert with the course of conduct to obtain the property. *Id*. at pp. 47 – 48. She further argued that this case was a snatching that only escalated due to Thompson's desire to get away from Santay because he would not let Thompson go. *Id*. at p. 49. Counsel offered her view that the evidence provided at trial showed that Santay not only resisted Thompson's effort to take his wallet, but also held onto Thompson because he wanted "this person caught." *Id*. at p. 46. Counsel relied on *West v. State*, 312 Md. 197, 539 A.2d 231 (1988) for the proposition that snatching property where there is asportation of the property without force or threat of force, is not robbery. *Id*. at p. 45.

In rebuttal, the State agreed that the crime began as a snatching of Santay's wallet, but it did not end that way. *Id*. at pp. 51 – 53. The State relied on Thompson's statement to the police that he thought about the knife and "as soon as [he] remembered [he] had it . . . [he] went for it and used it" to support a finding of premeditation in support of first degree murder. *Id*. at p. 52. The State also agreed that the *West* decision was instructive as it held that where a victim of a snatching resists, no matter how slight, the offense is robbery. *Id*. The asportation element of robbery, according to the State, was supported in this case by the evidence that Santay's wallet was torn into two pieces. *Id*. at p. 53.

In denying the motion for judgment of acquittal the trial court noted that the evidence was sufficient for all counts to go to the jury and that the issues raised by defense counsel were questions of fact for the jury. ECF 5 at Ex. 4, p. 53. Upon renewal of the motion, the trial court observed that defense counsel's theory of the case would require the jury "to disregard the testimony of the witnesses who indicated that there was a discussion between Santay and Thompson." *Id*. at p. 58. The trial court again indicated that it was for the jury to decide

whether the witness who said she heard the two men exchanging words actually heard those statements. *Id.*

Thompson waived his right to testify in his own defense. *Id.* at p. 56. The defense presented no further evidence. *Id.* at pp. 57 and 60.

The jury was instructed as follows regarding attempted robbery with a dangerous weapon and robbery with a deadly weapon:

> In order to convict the Defendant of attempted robbery with a dangerous weapon, the State must prove all of the elements of robbery and must also prove that the Defendant committed the robbery by using a dangerous weapon.
> ***
> Robbery is the taking and carrying away of the property from someone else by force or threat of force with the intent to deprive the victim of the property.
> In order to convict the Defendant of robbery, the State must prove theft, that is, that the Defendant took the property by force or threat of force, and that the Defendant intended to deprive the victim of the property.
> ***
> If there is any injury to the person of the owner in the taking of the property or if he resists the attempt to rob him and his resistance is overcome, there is sufficient violence to make the taking robbery however slight the resistance. In other words, sufficient force must be used to overcome resistance and the mere force that is required to take possession when there is no resistance is not enough.
> Attempt.  Attempt is a substantial step beyond mere preparation toward the commission of a crime.  In order to convict the Defendant of attempted robbery with a dangerous weapon, the State must prove that the Defendant took a substantial step beyond mere preparation toward the commission of the crime of robbery with a dangerous weapon and that the Defendant intended to commit the crime of robbery with a dangerous weapon.
> ***
> In order to convict the Defendant of robbery with a dangerous weapon the State must prove all of the elements of robbery and must also prove that the Defendant committed the robbery by using a dangerous weapon.
> ***
> In order to convict the Defendant of first degree felony murder the State must prove that the Defendant attempted to commit the felony of robbery with a dangerous weapon, that the Defendant killed the victim and that the act resulting in the death of the victim occurred during the attempted commission of the felony, that is, robbery with a dangerous weapon.

ECF 5 at Ex. 4, pp. 70 – 73.

After the jury was charged and began deliberations, a question requesting clarification on "attempt" was sent to the court.  During a bench discussion, the State's Attorney noted a typographical error in the instruction regarding felony murder.  The instruction omitted the phrase "committed or attempted to commit" and "the commission or the attempted commission" and only included an attempt to commit the felony of robbery.  Because the question came late in the day, the jury was excused and the question was addressed the following Monday.  ECF 5 at Ex. 4, pp. 131 – 40.

Upon reconvening, the court provided the jury with corrected written instructions and orally instructed the jury as follows with regard to first degree felony murder:

> [Y]ou will see that in order to find the defendant guilty of first degree felony murder, you would have to find that he committed or attempted to commit the felony of robbery, that he did, in fact, kill the victim, and that the act resulting in the death of the victim occurred during the commission of a felony.

ECF 5 at Ex. 5, p. 5.  In addition, the instruction on attempt was provided as a separate written instruction.  *Id*. at p. 4.

The jury returned verdicts of not guilty of attempted robbery with a dangerous weapon; guilty of robbery with a dangerous weapon; guilty of first degree felony murder; and not guilty of first degree premeditated murder.  *Id*. at pp. 18 – 19.

On April 9, 2009, at the sentencing proceeding defense counsel argued a motion for a new trial asserting that the evidence was not sufficient to justify or satisfy the verdict particularly with regard to establishing that Thompson had the requisite intent to commit an armed robbery.  ECF 5 at Ex. 6, pp. 4 – 10.  The State argued that the robbery was clear because "[y]ou had a wallet that was intact when the victim went up to the cashier's window and during the course of the accosting by this gentleman that wallet was torn in two."  *Id*. at p. 10.  The court denied the motion, noting that a witness, Rachel Stokes, testified that she heard Thompson say "just give it

to me" establishing Thompson's intent to rob Santay. *Id*. at p. 12.   The court imposed a sentence of life, all but 50 years suspended with five years of probation. *Id*. at pp. 59 – 60.

### State Appellate and Post-Conviction Review

On direct appeal Thompson, through counsel, alleged that the trial court erred in refusing to instruct the jury that the State had to prove each element of the felony-murder charge beyond a reasonable doubt; in denying the motion to suppress Thompson's statements to the police; and in instructing the jury with regard to the crime of robbery with a deadly weapon.  ECF 5 at Ex. 7. With regard to the jury instruction on robbery, Thompson objected to the inclusion of a paragraph that did not appear in the pattern jury instructions and read as follows:

> If there is any injury to the person of the owner in the taking of the property, or if he resists the attempt to rob him, and his resistance is overcome, there is sufficient violence to make the taking robbery, however slight the resistance. In other words sufficient force must be used to overcome resistance and the mere force that is required to take possession, when there is no resistance, is not enough.

ECF 5 at Ex. 10, p. 12.

In rejecting Thompson's claim regarding the instruction on armed robbery, the Maryland Court of Special Appeals observed:

> The appellant attempted to persuade the jury that he never intended to rob the victim but only intended to snatch the victim's wallet by way of a minor theft. Defense counsel argued to the jury:
>
>> "The State has to prove to you that Danny [Thompson] used force to take, and take control over the property that belonged to another, and what Danny did was try to do a theft, a snatching of that and then he couldn't get away.  The important part of this case all goes to the intent."
>
> Under the circumstances, the subtle differences between robbery and theft and the significance of both force and possession were issues in the case.  In overruling the appellant's objection to the fourth paragraph, Judge Ensor stated:

> THE COURT:  I think that with respect to what is now [Amended Instruction] 17, give the presentation by the defense in the charge of robbery, it seems to have become one, so I do think that it is important to make that – to distinguish that for the jury.  So I think it's an accurate statement of the law and appropriate in this particular case.
>
> We see no abuse of discretion in that ruling or in the inclusion of the fourth paragraph to the jury instructions.

ECF 5 at Ex. 10, pp. 13 – 14. [2]

In his Petition for Post-Conviction Relief, he asserted he was entitled to relief due to the legally inconsistent jury verdicts and, to the extent the claim was not raised at trial, it was ineffective assistance of counsel to fail to raise the claim.  ECF 1-1, *see also* ECF 5 at Ex. 12, pp. 10 – 11.   Specifically, the claims raised were that the verdicts of not guilty for attempted armed robbery and guilty for armed robbery are legally inconsistent and therefore illegal under *Price v. State*, 405 Md. 10, 949 A.2d 619 (2008); trial counsel rendered ineffective assistance of counsel by failing to object to the legally inconsistent jury verdicts and appellate counsel rendered ineffective assistance by failing to raise it on appeal; the trial court erred in refusing to instruct the jury that the State must prove each element of a crime beyond a reasonable doubt; and trial counsel rendered ineffective assistance by failing to preserve the issues asserted.  ECF 1-1 at p. 1.

A post-conviction hearing was held in the Circuit Court for Baltimore County on November 28, 2012.  ECF 5 at Ex. 12.  The State argued that an objection to legally inconsistent jury verdicts is a matter of strategy inasmuch as the objection puts the defendant at risk of being convicted of yet another charge and the sole right to raise the objection belongs to the defendant's trial and appellate counsel.  *Id.* at pp. 12 – 14.  Neither trial nor appellate counsel

---

[2]        Thompson's Petition for Writ of Certiorari was denied by the Maryland Court of Appeals.  ECF 5 at Ex. 11.

raised the issue of an inconsistent jury verdict in Thompson's case and, in the State's view, the matter was waived. *Id.* In addition, the State argued that defense counsel was not ineffective because given that the jury found Thompson guilty of the consummated crime of robbery, the jury would have easily reached a guilty verdict on the attempted robbery once they were told it was a lesser included offense. *Id.* at p. 14.

At the hearing, Thompson's trial counsel testified. ECF 5 at Ex. 12, pp. 16 – 20. Counsel testified that at the time of trial she was unaware of caselaw in Maryland making inconsistent verdicts improper and that she did not perceive a problem with respect to an inconsistency in the verdicts in this case. *Id.* at pp. 18 – 19. She further testified that had she known that inconsistent verdicts were no longer allowable she would have objected to the inconsistent verdicts in Thompson's case. *Id.* at p. 20.

Under cross-examination, counsel stated her position at trial was that there was no robbery in Thompson's case; rather, there was a "snatching" which is not robbery under the holding in *West v. State*. Counsel admitted, however, that the same case stands for the proposition that if there is any resistance by the victim the snatching becomes a robbery. *Id.* at pp. 21 – 22. Counsel further conceded that the jury's verdict indicated that with respect to the robbery in this case, they sided with the State's view of the evidence. *Id.* at p. 22.

Thompson also testified at the post-conviction hearing and stated that neither trial counsel or appellate counsel discussed the issue of inconsistent jury verdicts with him and had he known about the issue he would have brought it up. ECF 5 at Ex. 12, pp. 30 – 32.

In its decision denying post-conviction relief, the court first noted that the holding in *Price*, 405 Md. at 29, which was decided nine months prior to Thompson's trial, held that legally inconsistent jury verdicts in criminal cases would no longer be tolerated in Maryland. ECF 1-1

at p. 3.  "'[L]egally inconsistent verdicts are those where a defendant is acquitted of a lesser included crime embraced within a conviction for a greater offense.'"  *Id.* quoting *McNeal v. State*, 426 Md. 455, 458 n. 1 (2012).  Under Maryland law, "'an attempt is a lesser included offense of the consummated crime, that the elements of attempt are contained in the consummated crime, and that only the consummated crime has an additional or distinct element.'"  *Id.* quoting *Moore v. State*, 388 Md. 623, 646 (2005).  The post-conviction court noted that the not guilty verdict on attempted robbery was legally inconsistent with the guilty verdict on armed robbery.  ECF 1-1 at p. 3.

The post-conviction court found that the issue of the inconsistent verdicts was waived when it was not raised at trial or on appeal because it is a non-fundamental right.  ECF 1-1 at p. 4, citing *Grandison v. State*, 425 Md. 34, 61, 38 A.3d 352, 368 (2012).  The court noted that "'[f]undamental rights or interests are those 'explicitly or implicitly guaranteed' by the federal constitution.'"  ECF 1-1 at p. 4, quoting *Doe v. Dep't of Pub. Safety & Corr. Servs.*, 185 Md. App. 625, 639, 971 A.2d 975, 983 (2009).  The rule regarding inconsistent verdicts was developed over time and as a matter of Maryland common law.  ECF 1-1 at p. 5.  In addition, Maryland's rule regarding inconsistent verdicts is a minority rule and is not one of constitutional dimension.  *Id.*

With regard to Thompson's claim that trial and appellate counsel were ineffective when they failed to object to the verdicts or raise the issue on appeal, the post-conviction court found in pertinent part that "[t]he appellate courts of this state have held that counsel's failure to act based on an ignorance of the law constitutes deficient performance" and "[t]he Court of Appeals has further held that appellate counsel may render ineffective assistance by failing to raise a particular issue on appeal."  ECF 1-1 at pp. 7 and 8.  The court then concluded that:

> In light of the caselaw discussed above, and under the circumstances of this case, this Court finds that trial counsel's failure to object to Petitioner's legally inconsistent verdicts, on account of her admitted ignorance of the law, constituted a deficient performance.
>
> Similarly, this Court finds that appellate counsel was deficient for failing to raise the issue on direct appeal. A proper review of the trial record would have revealed the inconsistency in the verdicts returned by the jury.

ECF 1-1 at p. 8.

The post-conviction court then found that the deficient performance did not prejudice Thompson and noted that "[t]he critical inquiry is whether the failure to preserve or raise a particular claim on appeal undermines the reliability of [the]conviction." *Id*. at p. 10. The post-conviction court noted its agreement with the State's argument that "considering the evidence presented against [Thompson] at his trial, as well as the jury's verdict of guilty on the felony murder count, had the jury been instructed on the range of permissible verdicts, it would have convicted [Thompson] of attempted armed robbery in addition to armed robbery and felony murder." *Id*. In addition, the court noted that the jury was "simply not instructed that . . . the elements of attempt are all contained within the consummated offense, and a conviction of armed robbery therefore entails a conviction for attempted armed robbery." *Id*.

Particularly relevant to the matters asserted in this Court, the post-conviction court then observed that it was:

> [C]onvinced beyond a reasonable doubt that, had an objection been made, the jury would have simply been instructed on the range of permissible verdicts, and would then have returned a guilty verdict on attempt in addition to the guilty verdicts for armed robbery and felony murder. Similarly, appellate counsel's failure to raise the issue on appeal did not prejudice Petitioner because the Court of Special Appeals would have found that under the circumstances, the error was harmless.

ECF 1-1 at pp. 10 – 11.

14

**Claim Presented in this Court**

Thompson alleges that the state post-conviction court unreasonably applied the standard announced in *Strickland v. Washington* when it concluded that Thompson's trial and appellate counsel's deficient performance in failing to raise the issue of legally inconsistent verdicts did not prejudice Thompson.  He argues that the only means by which the post-conviction court reached such a conclusion was via speculation about what the jury would do if it had been reinstructed and directed to continue deliberations.

It is not disputed by the parties that the verdict in Thompson's case was legally inconsistent and that Maryland law does not permit legally inconsistent verdicts.  The decision announcing Maryland's decision to part ways with the United Supreme Court's decision in *United States v. Powell*, 469 U.S. 57 (1984), permitting inconsistent jury verdicts to stand, was issued nine months prior to Thompson's trial.  *See Price v. State*, 405 Md. 10, 19 (2008), *see also McNeal v. State*, 426 Md. at 458 (2012) ("legally inconsistent verdicts are those where a defendant is acquitted of a 'lesser included' crime embraced within a conviction for a greater offense.").  Trial counsel testified at the post-conviction hearing that the reason she did not raise an objection to the jury's inconsistent verdict acquitting Thompson of attempted robbery and convicting him of robbery and felony murder was that she was unaware of the decision in *Price*.  Appellate counsel did not testify at the post-conviction hearing, but the post-conviction court found that both trial and appellate counsel were deficient in failing to raise the inconsistent verdict issue.

Thompson assigns error to the post-conviction court's conclusion that the deficient performance of counsel did not prejudice him.  He asserts that had the issue been raised while the jury was still empaneled, the jury would have been reinstructed and directed to further deliberate

with Thompson's presumption of innocence intact; had it been raised at sentencing or on direct appeal, Thompson states he would have been granted a new trial. This, Thompson argues, is sufficient to establish that he was prejudiced by the deficient performance of counsel.

Thompson argues that the post-conviction court's "speculations" that the jury, had it been reinstructed, would have returned a verdict of guilty as to both attempted robbery and robbery invaded the province of the jury's role.  Maryland's rejection of inconsistent verdicts is based on the rationale that those verdicts requires speculation as to the jury's motives which may include leniency, compromise, or outright confusion.  Thompson asserts that since the matter of whether a robbery had occurred or was attempted was hotly contested at trial, the inconsistent verdict in this case is evidence of the jury's confusion as to the meaning of attempt, requiring modification of the instructions on attempt.  Thus, according to Thompson, there was at least a reasonable probability that if the jury was reinstructed and continued to deliberate, it would have determined that there was no armed robbery and there would be no felony murder predicated on that robbery.

**Standard of Review**

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings" *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).  The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, __,  131 S.Ct. 1388, 1398 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* __ U.S.__, __, 134 S.Ct 1697, 1702 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103, 131 S. Ct. 770, 786-87 (2011) (state prisoner

must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude

that the state court decision was based on an unreasonable determination of the facts. *Id.* **"**[A] a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly.*"* *Renico v. Lett,* 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.* at 379.

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id.* at 696.

Because the instant petition is subject to the provisions of the federal habeas statute, 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996

("Act"), in order to obtain relief on his ineffectiveness claims, the petitioner must show that the adjudication of such claims at the state court level:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;    or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Act further provides that:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

As the Supreme Court held in *Strickland v. Washington*, *supra*, "a state court conclusion that counsel rendered effective assistance of counsel is not a finding of fact binding on the federal court to the extent stated by [former] 28 U.S.C. § 2254(d)[ now § 2254(e)(1)]." *Id.* at 698.  Rather, "although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254[(e)(1)], . . . both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.*  It follows, then, that § 2254(d)(1) applies to the state court's conclusion that the petitioner's trial counsel rendered effective assistance of counsel and this Court may not grant relief on this claim as long as the state court denied the claim based on a reasonable application of the *Strickland* standard to the facts presented in the state court proceeding.

## Analysis

Under the standard outlined above, this Court must presume correct the post-conviction court's factual conclusion that trial counsel's failure to object to the inconsistent verdict was not

a trial tactic and was in fact an error based on her lack of awareness of the law. Whether that failure constituted deficient performance under the Sixth Amendment is a legal conclusion that does not require the same deference. Thus, contrary to Thompson's argument that this Court must only look at the prejudice prong in the *Strickland* analysis and may not revisit the issue of deficient performance is erroneous.

Respondents argue that the post-conviction court's analysis of Thompson's ineffective assistance of counsel claim turns entirely on the application of state law. Indeed, the post-conviction court's finding that trial and appellate counsel were deficient it observed that:

> The appellate courts of this state have held that counsel's failure to act based on an ignorance of the law constitutes a deficient performance. See, e.g., *Adams v. State*, 171 Md. App. 668, 714-715, 912 A.2d 16, 43-44 (2006) (counsel was deemed to have rendered ineffective assistance where counsel was unaware of a change in the law by the Court of Appeals, set forth in an opinion filed two years before defendant's trial, and on that basis, failed to object to an erroneous jury instruction); *Redman v. State*, 363 Md. 298, 310, 768 A.2d 656, 662 (2001) (trial counsel's failure to inform the defendant of the right of automatic removal in capital cases—because trial counsel was unaware of the law—constituted deficient performance); *State v. Peterson*, 158 Md. App. 558, 597, 857 A,2d 1132, 1154 (2004) (counsel was deemed to have rendered ineffective assistance where he did not understand the law as to battered spouse syndrome and on that account failed to present available evidence to establish that defense); *Whitney v. State*, 158 Md. App. 519, 530, 857 A.2d 625, 631-632 (2004) (counsel was deemed ineffective for not knowing how many peremptory challenges the law granted a criminal defendant).
>
> The Court of Appeals has further held that appellate counsel may render ineffective assistance by failing to raise a particular issue on appeal. *See Moosavi v. State*, 355 Md. 651, 661-62, 736 A.2d 285, 290-91 (1999) (holding that where the only reason for not reversing defendant's conviction was the failure of appellate counsel to raise a particular issue on direct appeal, defendant would be entitled to post conviction relief); *Wilson v. State*, 284 Md. 664, 676, 399 A..2d 256, 262-263 (1979) (Post Conviction Procedure Act "contemplates that an accused be granted a belated appeal as a remedy to obtain full appellate review of his allegations of error, constitutional in scope, and neither finally litigated nor waived," when he has been denied appellate review of a claim "due to improper action of his appellate counsel.").

ECF 1-1 at pp. 5 – 6.   Whether that failure constitutes deficient performance under federal law requires more than a simple failure to raise a claim.  *See Strickland*, 466 U.S. at 691 ("An error by counsel even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."); *see also Kimmelman v. Morrison,* 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect").  "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Thompson's "burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Harrington*, 526 U.S. at 104.  In the instant case, trial counsel's failure to object to the inconsistent verdict does not approach the deficient performance referenced.  In light of the jury's finding that Thompson was guilty of committing robbery, not attempting one, it was clear that the jury had rejected the defense's argument that the State's evidence did not support all the elements of robbery.  The defense's theory of the case, that Thompson simply engaged in a snatching and not a robbery, was clearly rejected by the jury in favor of the State's theory that Santay's subsequent resistance to Thompson's attempt to "snatch" the wallet, coupled with Thompson "overcoming" that resistance, converted the snatching to an armed robbery that culminated in Santay's death.  Trial counsel's failure to object to the inconsistent verdicts and appellate counsel's failure to raise it on appeal was neither constitutionally deficient nor did it result in prejudice to Thompson.

The post-conviction court's conclusion that Thompson's Sixth Amendment right to effective assistance of counsel was not violated is without error.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue.  *See* 28 U. S.C.§ 2253(c)(2).

A separate Order follows.


<u>September 28, 2016</u>                          <u>        /s/        </u>
Date                                 William M. Nickerson
                                     Senior United States District Judge